Filed 8/29/22  In re M.P. CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M. P. et al., Persons Coming Under the Juvenile Court Law. | |
| MARIN COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. M.Y., Defendant and Appellant. | A163678 (Marin County Super. Ct. Nos. JV26498A & JV26499A) |

M.Y. appeals from juvenile court orders terminating her parental rights to two of her children and selecting adoption as the children's permanent plan. She contends the juvenile court erred in failing to apply the beneficial relationship or sibling relationship exceptions to termination of parental rights, and in failing to order a bonding study before selecting the permanent plan. We affirm.

## BACKGROUND

### The Prior Dependency Case

M.Y. (mother) is the mother of M.P. and J.P. (the minors) and their older half sisters E.E. and N.E.; the minors' father (father) is the stepfather

1

of E.E. and N.E.[1]  M.P. and J.P were six years old and three years old, respectively, when they were initially taken into protective custody by the Marin County Social Services Agency (Agency) due to their father's sexual abuse of E.E. and mother's failure to protect E.E. and her other children.  A juvenile dependency petition was filed in July 2017, after then 14-year-old E.E. disclosed that father sexually abused her repeatedly when she was "between third and seventh grade," including violent, forcible vaginal and anal penetration.  When E.E. told mother about the abuse, mother blamed her, said she did not believe her, and continued to allow father to be with E.E. unsupervised.  N.E., then 10 years old, disclosed an incident in which the father touched her groin area and she slapped his hand away, and later reported two incidents of molestation.  N.E. also claimed that father repeatedly attempted to bribe her to allow him to touch or kiss her in a sexual manner, and said that she informed mother, but mother took no protective actions.  Both E.E. and N.E. reported that mother continued to leave all the children alone with father.

Father was arrested on multiple charges of sexually assaulting E.E., but the criminal case was subsequently dismissed.  Mother divorced father in 2017.[2]

Mother received reunification services and in July 2018, M.P., J.P., and N.E. (who at some point had recanted her abuse allegations) were returned to mother with family maintenance services.[3]  In April 2019, the juvenile court

---

[1] Mother told the Agency that E.E. and N.E.'s father returned to Mexico when N.E. was a baby and E.E. about five years old; mother married M.P. and J.P.'s father when N.E. was about 18 months old.

[2] Mother married her current husband in 2019.

[3] Reunification services were not offered to father.

2

awarded mother sole custody of M.P. and J.P., with professionally supervised visitation for father, and terminated jurisdiction. The court issued a protective order preventing father from having any contact with E.E. and N.E. Mother did not reunify with E.E., who was placed under a legal guardianship with her caregivers.

### *The Present Dependency Petition and Jurisdiction*

M.P. and J.P. were again taken into protective custody in January 2020, after N.E. reported that father forcibly raped and sexually abused her when she was five years old to 11 years old and said she had recanted her previous allegations because mother told her to lie and say father did not abuse her. N.E. said mother was "present/sleeping" during at least one sexual assault, and that others occurred while M.P. and J.P. were in the room or in the back of the car. She also reported that M.P. and J.P. had been visiting with father at least twice a week.

Father was arrested for sexually abusing N.E., charged with oral copulation with a child under 14, sodomy with a person under 14 or with force, and penetration with a foreign object of a child under 14. He remained in custody throughout these proceedings.[4]

The petition filed on January 15, 2020, alleged, in essence, that there was a substantial risk M.P. and J.P. would be sexually abused by father based on N.E.'s disclosures and the prior case involving father's abuse of E.E., and that although mother knew or should have known of the danger, she failed to protect the minors by allowing visitation with father without the

---

[4] As of the contested 12-month review hearing in April 2021, father had not yet gone to trial. The record contains no subsequent information about the status of his criminal case.

Father was represented by counsel throughout the proceedings and is not a party to this appeal.

3

professional supervision required by the 2017 exit orders, and allowed father to have contact with N.E. in violation of no-contact orders.[5]

J.P. told the social worker that she saw father twice a week and that father babysat her and M.P. the week before because mother had to work. She said that mother took her, M.P., and N.E. to father's job one day and when father said hello to N.E., N.E. swore at him and told him not to talk to her again. In a subsequent forensic interview, J.P. said that father would babysit her and M.P. at his apartment while mother was at work, and her uncles were " 'sometimes' " there.

M.P. told the social worker she did not have visits with father and could not remember the last time she saw him, then said that she saw him at his house in 2017, and that she and J.P. had visits with him that ended in 2018 or 2019. M.P. was sullen and quiet during the interview, became "teary eyed," and said she wished she saw father more often. In her forensic interview, M.P. said she had not had contact with father since the 2017 case closed, and the last time she saw him a social worker was present. She said she felt safe with mother and was sad she was not with her, and denied that anyone "hurt her body" or told her to keep secrets. M.P. seemed "guarded and cautious" throughout her interview and cried at various points.

Mother admitted the children had visits with father that were not professionally supervised, saying she thought they could be supervised by anyone. She initially told the social worker she was always present at visits

---

[5] The petition contained allegations under Welfare and Institutions Code section 300, subdivisions (b) (failure to protect), (d) (sexual abuse), and (j) (abuse of sibling). Pursuant to an agreement among the parties, an amended petition filed on April 15, 2020, alleged the same factual background under subdivisions (b) and (j) of section 300, and omitted allegations under subdivision (d).

and subsequently said she always made sure the visits were supervised by one of the minors' uncles. She said neither she nor father could afford to pay for professional supervision and she "felt bad" because the minors asked to see their father. Mother said that when she took M.P., J.P., and N.E. to father's workplace, N.E. stayed in the car "with the window up and a hat on and father 'didn't even know she was there' until N.E. started crying and yelling at him."

Father initially told the social worker he saw M.P. and J.P. weekly or biweekly at the mall when mother would leave the children with him and his brother while mother shopped. Later, father said he had seen the minors one or two times when he ran into them at the mall by chance and stopped to talk and eat pizza, with mother present. He denied that M.P. and J.P. ever came to his house when he was there. Father said that on the day mother brought the three girls to his workplace, he did not know N.E. was there and did not approach or say anything to her. He denied the sexual abuse allegations as he had before; he believed N.E. was accusing him because she did not receive Christmas gifts from him in 2019, and was jealous of gifts he gave M.P. and J.P.

E.E. told the social worker she believed mother knew father had sexually abused N.E. because N.E. had told her that she and the minors had seen father and that prior to the visit, mother had been telling N.E. to forgive father for what he did to her and E.E. E.E. said mother brought N.E. to the visit with the minors so N.E. could see father and forgive him.

Mother told the social worker she would only believe N.E.'s abuse allegations when N.E. "tells her to her face what happened to her." She said she now believed what E.E. had disclosed in the prior case but only after having talked to E.E. about it directly. Mother's main goal was to reunify

5

with M.P. and J.P.; she agreed to N.E. remaining in the care of her resource family (E.E.'s legal guardians) if N.E. felt better living with them. A legal guardianship was subsequently established for N.E. with E.E.'s legal guardians.

The court sustained the petition at an uncontested jurisdiction hearing on April 21, 2020, ordered supervised visitation for mother, and prohibited any contact between father and the minors.

### *Disposition and Reunification Services*

The Agency's disposition report stated that the main problem requiring intervention was that mother failed to protect E.E. and N.E. from sexual abuse by father that occurred over many years and, despite the previous dependency case, mother continued to minimize the disclosures of abuse by the older daughters and disregarded court orders "put in place to protect the girls from potential harm." The Agency stated that the causes of mother's failure to protect her children from sexual abuse needed further exploration, suggested she might be impeded by past trauma and/or mental health condition, and noted that mother had participated in therapy for over two years but had been reluctant to discuss her "mental and emotional health" with the Agency. The social worker observed that when mother was experiencing high levels of emotional stress, she was "unable to emotionally regulate herself" and became "so overwhelmed and distressed that she [could not] act in ways that prioritize the emotional wellbeing of her children." The social worker commented that mother's inability or unwillingness to discuss the past sexual abuse made it difficult to assess how she would recognize possible signs of abuse in the future and act protectively.

Mother reported feeling sad and depressed with the current circumstances and had made suicidal statements to the social worker and

others, but she was continuing to see the therapist she began to see during the prior case and reported that therapy was helpful. Mother felt the minors needed to return to her care because the separation from her was difficult for them. She was meeting with the social worker and participating in "Child and Family Team" meetings, and had social support from friends and family. The social worker noted that mother had "little trust" in the Agency.

The minors were reported to have a close and supportive relationship with each other. The second removal from mother's care had been traumatic for M.P. and she was experiencing "a lot of sadness and anxiety"; J.P. was also experiencing sadness due to the separation from mother. Both minors were actively engaged in therapy. They had been placed in a long term resource home at the end of January 30, 2020, appeared to be content and at ease there, and were able to maintain connection with their older sisters, who lived nearby.

Mother had weekly supervised visitation with the minors, which had been conducted by video conference since implementation of shelter in place orders due to the pandemic. Mother attended visits consistently, the visits were "appropriate and positive" and the minors looked forward to them and expressed wanting more time with mother.

At the disposition hearing on May 5, 2020, the juvenile court adjudged M.P. and J.P. dependents of the court, found out-of-home placement necessary and the minors' current placement appropriate, ordered reunification services for mother, and denied reunification services for father.

**The Agency Requests Termination of Reunification Services**

In October 2020, about three weeks ahead of the scheduled six-month review hearing, the Agency filed a "Request to Change Court Order" asking the juvenile court to terminate mother's reunification services due to her

failure to make behavioral changes and inability to focus on the need to act protectively toward the minors. The Agency reported that mother continued to "maintain[] the narrative that she has done nothing wrong and that she is being victimized" by the Agency and "routinely denies the sexual abuse that her eldest daughters experienced and continues to maintain that she does not believe their allegations, no matter how credible they may seem." The Agency saw "little to no behavioral change" despite mother having received extensive services, noted that between the two dependency cases the minors had been in out-of-home care for 22 of the past 40 months, and believed it would be in the minors' best interests for the Agency to shift its focus toward an alternative placement plan.

On the same day it filed its request to change the court order, the Agency filed its status report for the six-month review hearing. Mother had begun a support class for parents of sexually abused children, but the providers were concerned that her defensiveness would interfere with her ability to learn from the class, and that "because of [mother's] denial, she may never be fully capable of acting protectively toward her younger daughters." Mother's therapist attended the second session for support and mother was "more open" but "continuously ask[ed] why her children were removed," repeatedly said she was the one being punished by having her children taken away, and did not express either blaming father or being concerned about the minors. Mother told the social worker she felt the sessions were "forced" and it was difficult to discuss sexual abuse because she wanted to " 'leave it all behind' and focus on positive things." Mother felt her daughters could come to her about anything and said she had always listened to them and would do whatever she could to protect them if they told her something had happened. She said she understood she had to be aware of

8

other warning signs because children do not always report abuse and felt the class was not providing information she had not already discussed in therapy.

Mother's denial was also reflected in an evaluation performed in connection with her mental health services,[6] during which mother "denied any current or historical depression or suicidal ideation," and explained that she did not believe her older daughters' reports that they had been sexually abused by her ex-husband. When the social worker asked mother about this, she acknowledged having read the police reports and being told about the allegations, but said she did not believe it because her daughters never told her about it. Mother said, " 'I don't know if it happened or didn't happen.' "

---

[6] The evaluation by the Marin County Access Team (Access) related to a component of mother's case plan requiring her to undergo a psychiatric medication evaluation, which mother was to arrange through Access. Mother told the social worker the Access evaluation concluded she did not need to see a psychiatrist, but the evaluation in fact stated that mother had a diagnosis of "Major Depressive Disorder Mild Recurrent" and declined a medication evaluation or other referral. After about two months of efforts to help mother obtain a referral, mother told the social worker she had been taking medication for anxiety/depression daily since the beginning of the 2017 dependency case but had not disclosed this earlier because "she felt oppositional to the [Agency] 'telling' her that she needed a medication evaluation. She also had not told her therapist about the medication. Mother's primary care physician told the social worker she had first prescribed the anxiety/depression medication in July 2019 and, although mother said in September 2020 that she had been taking it daily, the physician said this was not possible based on the number of refills. The physician also said she had referred mother for therapy because mother said she did not have an individual therapist. Mother met with a psychiatric nurse practitioner in October 2020 but had missed follow-up appointments. Based on the above, the Agency reported that mother had "actively worked against current case plan goals" by failing to engage with providers attempting to arrange services, misleading providers about her current emotional health needs, and being dishonest with the Agency and providers about medication.

9

Mother's therapist reported that mother was angry, depressed, and more resistant to treatment than she had been during the prior dependency case. After Mother's mother (grandmother) died in August 2020, mother "was unable to discuss other issues or moving forward with family sessions," she "appeared to only be able to focus on grieving." Mother told the social worker that "she was too consumed with grief from the loss of her mother to do family therapy."

When family therapy with M.P. began in mid-September, mother was resistant to bringing up topics she thought would hurt M.P. Nevertheless, the therapist felt there was a breakthrough in the second session, when mother told M.P. that the girls had been removed from home because father had " 'not respected' " N.E., and N.E. would not be returning home because she did not feel safe there.

During a visit with the minors on October 1, 2020, mother told M.P. that grandmother had passed away. Afterward, M.P. told her resource parent and her therapist that mother had said she " 'no longer had a mother' " and instructed M.P. not to tell J.P. because it would be too upsetting. The burden of the secret caused M.P. "a lot of anxiety," including several incidents of bed-wetting. This incident raised concern because "keeping secrets is often the foundation of sexual abuse dynamics" and the issue had been discussed with mother "as a part of her work learning about child sexual abuse." Mother denied telling M.P. to keep grandmother's death a secret and said she had not told J.P. because J.P. was busy playing on her phone. When told about the emotional impact of the experience on M.P., mother asked no follow-up questions about M.P., said she would not do any harm to her children, and asked how the social worker thought telling M.P. about the recommendation to terminate reunification services would go if this

10

incident had had such an impact on her. Mother's therapist was concerned about the incident but also felt mother was more stable than she had been in previous weeks and had been able to put feedback into practice.

Mother consistently attended visits with the minors, which the minors continued to look forward to and enjoy. The supervised visits transitioned from fully supervised to "check-in" visits but then back to supervised due to concerns about the secrecy incident with M.P. and the Agency's recommendation to terminate reunification services.

The Agency reported that the minors had a "strong connection" with the resource parents and were doing well in their placement and in school. They saw their older sisters often and enjoyed spending time with them. The minors frequently expressed missing mother. M.P. was having episodes of enuresis and encopresis, the frequency of which increased after family therapy sessions began in September 2020. M.P.'s therapist felt this was likely due to the "stress of the conversations and interactions," but potential medical causes were also being investigated.[7] M.P. was willing to discuss "big feelings" in therapy, which for her included "a sense of loss of family, worries about her siblings, and feeling unseen and/or uncared for by her mother." J.P.'s therapist reported that J.P. was often more willing to discuss "difficult topics" with the resource mother present. After learning that N.E. would not be returning home, both minors "routinely" expressed concern about not seeing her or returning home without her.

Referencing the egregious nature of the sexual abuse suffered by E.E. and N.E., their descriptions of mother blaming E.E. and telling N.E. to lie

_____

[7] The therapist cautioned that although there was no evidence M.P. had been sexually abused, it should be kept in mind that both conditions have a correlation with sexual abuse.

about the abuse, mother allowing father to see the minors in violation of court orders, and mother's continued denial despite "almost three years of services to address these concerns," the Agency saw "little recourse as to its recommendation" to terminate services.

A contested hearing on the Agency's recommendation to terminate reunification services was held in December 2020. The court concluded the Agency had established mother's lack of substantial progress. Although it questioned the likelihood that reunification would occur, the court was reluctant to terminate services early in light of the "extraordinary stress on everyone" attributable to the COVID-19 pandemic. The court denied the request to terminate reunification services despite not finding there was a substantial probability the minors could be returned, making clear it would have granted the Agency's request absent the pandemic.

***Twelve-month Review and Termination of Reunification Services***

In its report prepared in February 2021, the Agency related that the minors frequently expressed missing mother and anxiety about the impending court decisions. J.P. expressed sadness about not being able to live with her mother or older sisters, but these feelings did not impede her day-to-day functioning. The majority of the "big feelings" J.P. discussed in therapy involved missing mother or feeling sad about not being at home. M.P. continued to experience bowel and bladder dysfunction and digestive issues which were being investigated and treated. The resource parents observed that enuresis incidents were frequently coupled with other periods of emotional dysregulation (extreme sadness, anger, yelling, and crying). In November 2020, M.P. started to have episodes of screaming "for hours on end," hitting her head against the wall or pulling out her hair. These behaviors decreased after "Seneca Wraparound" services were put in place,

12

but M.P. still experienced significant worries and anxiety, especially at night. She described feeling scared about "people removing her from the house," and on one occasion answered, "yes" when the resource parent asked if she had ever been "hurt at nighttime." M.P. related memories about "her family yelling and screaming at night"; she described E.E. wielding a knife during an argument with mother, and seeing mother throw N.E.'s cell phone and break it because N.E. had failed to check in with mother. M.P. said "she is nice to her mother so her mother does not yell at her." The Agency's April 2021 addendum reported that "there have been no recent reports of extreme behaviors (screaming, pulling hair out)" and that M.P.'s enuresis/encopresis had improved.

The Agency reported that although mother engaged with the wraparound services for M.P., the clinician was concerned that mother "can become so caught up in her emotions that she doesn't think about the impact of her words on [M.P.]." When the team attempted to discuss the causes of M.P.'s anxiety and fear of the dark, mother denied that M.P. suffered from anxiety and claimed that she was "always happy" when she was with mother.

Mother consistently attended in-person and virtual visits and the visits were appropriate and positive. The visit supervisor related that mother appeared "really happy, engaged, attentive and inquisitive about her daughter[s'] lives," the minors appeared "very excited" to see mother and "they were affectionate and had good communication throughout the visits." The Agency continued to have concerns, however, based on mother's inability or unwillingness to acknowledge the minors' difficult emotions during visits. Although mother "would check in with her daughters and ask them if they were ok or if there was anything they wanted to talk about" during several visits in November and December 2020, she soon reverted to "not wanting to

13

acknowledge acting unhappy during visits in an effort to make the visits a positive experience." The Agency was also concerned about the visit which occurred on April 1, 2021, wherein the minors excitedly told mother about a planned trip with the resource family. Mother responded that she was sad that the minors were going without her. After this visit, the resource family observed that the minors' excitement waned and they were very sad about taking the trip.

After mother met with a new family therapist in a first step toward sessions with the minors, the therapist expressed concern that despite her willingness to learn, mother "consistently blam[ed] the system for everything that has happened" and is "missing the piece that acknowledges how hard this is for her children." M.P. told the resource parents that during the first family therapy session, mother had talked about cutting her hair short because it had been falling out in the shower due to stress; mother was crying, which made M.P. sad, but M.P. did not want to cry because she did not want to make mother "more sad." M.P. also related that mother referred to father as "[J.P.'s] father," which made M.P. so upset that she walked off camera and cried quietly, feeling like people only care about J.P. The family therapist "noted that [mother] doesn't seem to see or understand how things impact her daughters." He told the social worker that mother is not able to understand the information he shares with her, likely due to her own "trauma history," depression, loss of her older daughters, and fear of losing the minors. In another session, mother had an "over the top" positive reaction to M.P. saying she was going to court for the contested hearing. When mother pressed M.P. to tell her what she was going to say to the judge, the therapist intervened. The therapist felt "that [M.P.] really wants to say what [mother] wants but that it is too much pressure."

14

In January 2021, mother told the social worker for the first time that she was " 'starting to accept the truth' " that father had sexually abused E.E. and N.E., explaining that previously she had wanted to move on from painful topics but that now she was breaking down the barriers so she could learn how to better protect her children. Mother continued to insist she was not to blame for what happened to her children. She continued to "express feelings of victimization by the [Agency]," claiming that the Agency made her divorce father.

Mother's therapist related that mother was starting to reflect on the information provided to her and relate it to incidents in her life. By the end of the reporting period, the therapist found mother more emotionally stable and "in a great place to do the therapeutic work." Despite having admitted the sexual abuse occurred, however, mother maintained that she does not remember E.E. or N.E. telling her about it and was unable to acknowledge her responsibility to protect her daughters.

The Agency continued to recommend termination of reunification services. The minors' court-appointed special advocate (CASA) reported that the minors were thriving in their current placement and recommended that the case be reviewed again in six months. Mother asked the court to appoint an expert to conduct a bonding study.

At a contested hearing on April 14 and 15, 2021, the minors' attorney read a letter from M.P. to the court saying that she wanted to return to mother and felt mother should be given more time to work on the tools she needed to make sure it was safe for M.P. and J.P. to return home.

Mother testified that at first it was difficult for her to talk about the concerns that led to the minors being removed from her home because she was hurt by what happened and it was "not easy to assimilate" something so

15

painful, but she had learned through therapy to look for signs of abuse even if the children did not report it and to call the police or the Agency if something happened. She said that she had learned to listen to the children, to respond to their positive and negative emotions, and to involve herself more in their lives. Mother felt family therapy had been helpful and would be useful to continue; it had taught her to go at the minors' pace rather than expect them to go at hers. She felt her medication helped her to manage her emotions and be calmer, which allowed her to listen to the minors and be open to what they wanted to talk about. Mother testified that she believed E.E. and N.E. when they disclosed sexual abuse and denied ever saying she did not believe them. Asked if she understood why M.P and J.P. were removed from her care, mother said she made a mistake having N.E. in the car at father's workplace; she did not understand the order prevented all contact between N.E. and father, and, because father sexually abused N.E., mother "put them in danger with [N.E.] in the car." Asked if there was any reason N.E. was removed from her care, other than that mother allowed her to be around father, mother said she did not think so.

The juvenile court found return of the children would create a substantial risk of detriment, reasonable services had been offered, and there was not a substantial probability the children could be returned within six months. The court's explanation of its detriment finding emphasized (1) the mother's failure to abide by the protections put in place when the children were returned to her at the conclusion of the 2017 case; (2) her failure to gain insight into the minors' pain and need for protection; and (3) mother's false testimony, in particular, her statement that she had never denied that her older daughters had been sexually abused. The court terminated reunification services and set a Welfare and Institutions Code section 366.26

16

hearing for August 10, 2021.[8]  The court denied mother's request for a bonding study, explaining that there was no question that mother and the girls love each other, the court had information about their bond, and the court was concerned about the pressure a bonding study would put on the minors, especially M.P.

### *The Section 366.26 Reports*

In its July 23, 2021 report for the section 366.26 hearing, the Agency recommended that the court terminate the parents' parental rights and make adoption the permanent plan.  The minors' CASA "strongly" supported this recommendation.  Mother opposed the recommendation based on the beneficial parental relationship exception to adoption.  (§ 366.26, subd. (c)(1)(B)(i).)

The Agency reported that the resource parents wanted to adopt the minors but were willing to accept legal guardianship if that was what the court ordered.  Both minors told the social worker they felt loved by the resource parents and safe in their home, and could see it as their "forever home."  When M.P. was directly asked whether she would choose adoption or legal guardianship, she said she did not know; the social worker did not ask J.P. this question because she was too young to understand the difference.

The minor's prospective adoptive parents and the older sisters' legal guardians had arranged for all four siblings to see each other frequently at sleepovers, meals, and celebrations while the case was pending, and were committed to doing so in the future.  The minors had a trusting relationship with their sisters' legal guardians, whom the resource parents considered extended family.  The social worker reported that the minors were sad that

---

[8] Further undesignated code references are to the Welfare and Institutions Code.

17

they would not be returning home, yet they "demonstrated a wellness that they have not gained in the care of their mother" and "expressed excitement at the prospect of being adopted." An addendum report filed in September 2021, described various "bonding moments" between the minors and each of the resource parents and their extended families that reflected the girls' attachment and comfort.

After mother's reunification services were terminated, J.P.'s "behavior escalated" and she became more "combative" with M.P. The social worker viewed this as a stress reaction to the court process; with extra support the behaviors decreased "rather quickly." J.P.'s therapist reported that J.P. had demonstrated increasing comfort with the topic of adoption and was more open in discussing her feelings. M.P. was no longer showing the "intense behaviors" previously reported. She had asked for tools to help her manage difficult emotional moments and was working on this with her therapist, other providers, and the resource parents. She had shown "anticipation and excitement" at the possibility of being adopted.

Mother consistently attended visits with the minors. They would generally spend about half the visit watching short videos or movies and the other half chatting, looking at pictures, and playing. The minors laughed and had a good time visiting with mother, they exchanged affectionate greetings, and the visits typically ended "without any emotional disruption." However, the visit on July 8, 2021, was disrupted when mother found a tick in J.P.'s ear and the resource parents arrived to take J.P. to see a doctor. M.P. told the resource mother that she heard mother say, "and they say I'm a bad parent." M.P. was upset about mother saying " 'mean' " things about the resource parents and appeared to be conflicted about who to "side with." M.P. said that when J.P. asked what the tick looked like, mother showed the

girls pictures of ticks that were "huge, engorged, and attached to a person's skin" and a picture of a cat with "ticks all over its eyes"; M.P. wished mother had not shown them the pictures because they scared both minors.

M.P. said she could not show how she was feeling because " 'mommy was so upset.' " When the resource mother said she could always tell adults when they were making her feel uncomfortable, M.P. said she could never tell her mother that: " 'I can't talk about big feelings at home like I can here. That is something I am not going to miss about home." M.P. said that when she has "big feelings" at home, mother gives her a quick hug but does not know how to help her, and that mother " 'has anger problems.' " M.P. asked the resource mother to help her " 'learn how not to have to be strong for mommy or [J.P.]."

The Agency provided letters from the minors' therapists in an addendum report. M.P.'s therapist, after noting that she was not an evaluator, offered her professional opinion as a trauma specialist that adoption would be better for M.P. than legal guardianship. The therapist related that M.P. had rarely commented on visits with mother except to say they make her sad. M.P. had been disappointed by mother paying more attention to J.P. but had feelings of loyalty and missed mother. She appeared to fear hurting her mother's feelings or being rejected by mother if she talked about anything good happening in the resource family, felt burdened by having to keep herself, her mother, and J.P. in good spirits during visits, and wanted to protect mother from feeling bad. The therapist stated, "It is notable that this is in sharp contrast to the emotional turmoil she has expressed to me and to her resource parents." Explaining that a child who senses a parent will react unfavorably to conflict or distress learns to be cheerful and compliant so as not to upset the parent, and to express "big

19

feelings" with adults the child senses can handle them, the therapist saw M.P.'s "episodes of emotional dysregulation" before and after visits with mother as indicating "frustration that she could not have the emotional support she craves and the answers she desires." M.P. "now sees her mom as someone who is not able to provide the safety that is required for her wellbeing" and knows that her resource parents will provide her with more emotional support. According to the therapist, M.P. "conveys a peaceful resignation that this will be best for her in the long run." The therapist stated that the "tension of waiting, wondering, and worrying" over an extended period had been a "tremendous strain" for M.P. and believed legal guardianship would "become an untenable state of uncertainty" for her, while adoption would remove the uncertainty and allow her to "relax into her natural developmental tasks and focus entirely on being a smart, happy kid."

J.P.'s therapist stated that J.P. had slowly and steadily developed a secure attachment to her resource parents, who, despite tantrums and meltdowns, had consistently demonstrated "care, encouragement, and a fundamental high regard for [J.P.] (and [M.P.])." On occasions when J.P. brought up the topic of mother two to three times a month, "she is unable to talk about any feeling other than sadness." The therapist opined that "once uncertainty about placement was removed—i.e., adoption is finalized—this secure attachment and fundamental global trust would only deepen. Guardianship would prolong and exacerbate a dormant insecurity about a clear and reliable future," which would be a "certain detriment to [J.P.'s] accomplishment of developmental tasks."

***The Section 366.26 Hearing***

At the contested hearing, mother asked the court to reconsider its ruling on her request for a bonding study, and the court again denied the request.

The parties stipulated that the minors would testify that if they cannot live with mother, they want to live with their resource parents; they like the idea of adoption because they would not have to "deal with all the foster care rules," but they like the idea of guardianship because "it would be what their sisters had"; they would prefer guardianship if it meant they could have more time with mother; the visits with mother were good; and, according to M.P., the only thing bad about the visits "is when they have to leave."

The visitation supervisor testified that at the 24 or 25 visits since January 1, the minors and mother were excited to see each other; the girls would run to mother, hug her, and say "hey, mommy," and mother would hug them. Mother often told the minors at the beginning of a visit that she loved them, and they reciprocated; the minors spontaneously displayed affection, such as M.P. randomly holding mother's hand or J.P. sitting on mother's lap; and the minors snuggled with mother at almost every visit. Mother paid close attention to the minors, asked about school and praised the minors when they said they were doing well, and was supportive when they told her about something fun they had done. They talked about extended family members and looked at photographs from their life together. At the end of the last visit on September 2, after mother hugged and said "I love you" to

21

each of the minors, she looked teary-eyed as she walked away but remained composed.[9]

On cross-examination, the visitation supervisor acknowledged he had heard some concerns about mother speaking to the minors when they were in the bathroom. After the visit when mother found the tick, the resource parent told the supervisor that M.P. had a "safe word" to use if she felt uncomfortable during visits; the supervisor told M.P. they could do this and she told him the word, but she never used it during a visit.

The social worker testified that even after M.P. began working with the wraparound support team she continued to say she missed mother and was frustrated with the ambiguity of the situation. In March 2021, the resource parent texted the social worker to say M.P. was feeling sad about being away from her sisters and mother. In early April 2021, the resource parent conveyed concerns that mother told the minors, while in the bathroom during a visit, that E.E. was a liar.

The social worker told the children about the termination of mother's reunification services the day after the hearing, a Friday. On Monday, the resource mother called saying M.P. had been yelling at her over the weekend and both minors had a hard time going to school that day. The next day, the resource parent called again to say J.P. had had a "big breakdown," crying for almost an hour, repeatedly apologizing, and saying "this was all her fault." J.P. had previously reported feeling that if she had not talked to the social worker who came to her school, she would not be in foster care. J.P.'s behaviors escalated, including hitting M.P., and wraparound services were

---

[9] The visitation notes from January 1, 2021, to September 9, 2021, which mother introduced into evidence, are consistent with the supervisor's description.

22

put in place for her. Subsequently, after a family therapy session with mother, the resource parent called the supervisor to say that when the minors got home, M.P was sobbing and saying she missed mother and wanted to go home.

The social worker expressed the view, formed in consultation with the minors' therapists, that although the minors said they missed mother and wanted to go home, the stress caused by the lack of certainty about the future was driving their behaviors. Noting that it was common for children to miss their parents and want to go home even in cases of severe neglect and abuse, the social worker testified that the minors' initial upset when reunification services were terminated was normal. It was followed by a period of "calm and stability," and the minors were "doing incredibly well now that they have some certainty about what their future holds."

In closing arguments, the Agency argued against application of the beneficial relationship exception to adoption. Mother urged the court to apply both that exception and an exception based on sibling bonds. (§ 366.26, subd. (c)(1)(b)(v).) Counsel for the minors argued the evidence did not support finding that either exception applied, making clear that her position was contrary to the minors' preference for a legal guardianship.[10]

### The Court's Ruling

The court announced its ruling on September 28, 2021. Since the parties agreed mother had regularly visited the minors, the court discussed the second and third requirements for the beneficial relationship exception, expressly taking guidance from the California Supreme Court's decision in *In*

---

[10] Counsel told the court she was "heartbroken" to be arguing against the minors' wishes. Counsel explained that when she told the minors she did not think any of the exceptions to adoption apply in this case, "they were both sad," and M.P. said she "would like to speak to the President about that."

23

*re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). The court noted that the minors, then 10 and 7 years old, had been removed from mother's care twice since 2017, a total of two and a half years that constituted a quarter of M.P.'s life and almost half of J.P.'s.[11] The court described mother's visits with the minors as "generally positive" and overall demonstrating love and affection. It further noted that "[m]other has made some statements and taken some actions at visits which do not reflect positively on her parenting ability," and that the minors' therapists attributed the minors' "dysregulation" before and after visits to their "inability to be themselves with mother, her inability to handle big emotions, and the girls feeling responsible for mother's sadness." The court relied heavily on the therapists' opinions that the girls' greatest need was permanence and stability. It concluded that mother's lack of insight and inability to accept responsibility for the girls being in foster care, despite all the services she had received in the course of the two dependency proceedings, had defined her relationship with M.P. and J.P.

The court also found the sibling exception did not apply, explaining that the exception applies only if there is a "demonstrated interference" with such relationships and here there was a "strong track record" of the resource parents facilitating visits and communication between the minors and their older sisters.

The juvenile court terminated both mother and father's parental rights and ordered adoption as the permanent plan.

Mother's appeal followed.

---

[11] The court's calculations are not precise. The minors were outside of mother's care for a total of two years and eight months between the two dependency cases, which amounted to just under a quarter of M.P.'s life (.25) and between a quarter and half of J.P.'s life (.35).

24

## DISCUSSION

## I.

### *The Juvenile Court's Determination That Mother Failed to Establish the Beneficial Relationship Exception is Supported by Substantial Evidence*

As we explained in *In re J.D.* (2021) 70 Cal.App.5th 833, 851–852 (*J.D.*), "[t]he sole purpose of the section 366.26 hearing is to select and implement a permanent plan for the child after reunification efforts have failed.  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 304; see also § 366.26, subd. (b).)  At that stage, 'the welfare agency's focus shifts from monitoring the parents' progress toward reunification to determining the appropriate placement plan for the child.'  (*In re Marilyn H.*, at p. 305.)  The dependency statutes embody a presumptive rule that, after reunification efforts have failed, parental rights must be terminated in order to free a child for adoption.  (*Caden C.*, *supra*, 11 Cal.5th at pp. 630–631.)"  The statutes, however, provide an exception where " '[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances:   [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.'  (§ 366.26, subd. (c)(1)(B)(i).)"  (*Caden C.*, at p. 631.)  "[I]n assessing whether termination would be *detrimental,* the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home."  (*Id.* at p. 632.)  Throughout the analysis, "the focus is on the best interests of the child."  (*Ibid.*)

"As summarized in *Caden C.*, 'the parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things.  The parent must show regular visitation and contact with the child, taking into

account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption.' " (*J.D.*, *supra*, 70 Cal.App.5th at p. 852, quoting *Caden C.*, *supra*, 11 Cal.5th at pp. 636–637.)

On appeal, we review the juvenile court's decision on the first two elements—whether the parent "has visited and maintained contact with the child consistently" and whether "the relationship is such that the child would benefit from continuing it"—for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) In so doing, we follow the guiding principle that "a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' (*Ibid.*; see also 9 Witkin, Cal. Procedure (5th ed. 2020) Appeal, § 365.)" (*Caden C.*, at p. 640.)

On the third element, we review the determination whether termination of parental rights would be detrimental to the child for abuse of discretion. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) "A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal

discretion by making an arbitrary, capricious, or patently absurd determination.' " ' ([*In re*] *Stephanie M.* [(1994)] 7 Cal.4th [295,] 318.)  But ' " '[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " ' (*Id.* at p. 319; see also [*In re*] *Robert L.* [(1993)] 21 Cal.App.4th [1057,] 1067 ['The reviewing court should interfere only " 'if . . . under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did' " '].)"  (*Caden C.*, at p. 641.)

There is no dispute in the present case that mother satisfied the first of the three elements by virtue of her consistent visitation.  Mother argues that it is unclear whether the juvenile court found she established the second element (that the minors had a substantial, positive emotional attachment to her).  She maintains that reversal is required because the court considered improper factors in analyzing that question, which then affected the court's consideration of the third element (whether termination of her parental rights would be detrimental to the minors).  The Agency views the court's conclusion that minors' relationship with mother was "loving and affectionate" as an implicit determination that mother satisfied the second element of the exception and argues the court did not abuse its discretion in finding termination of parental rights would be detrimental.

### The Court's Reference to "Parenting Ability" Did Not Undermine its Analysis

Mother argues the court juvenile court erred by improperly relying on evidence that she did not act as a "parent" to the minors.  She points to the court's comment that she made statements and took actions that reflected negatively on her "parenting ability," as well as county counsel's argument that mother did not have a "parent-child" relationship with the minors

because the minors could not express all their emotions to her, and minors' counsel's argument that mother had an opportunity to "parent these children," "do the good parent thing" and "be a parent to these kids" but fell short.[12]

*Caden C.* made clear that a parent's ability to provide day-to-day care for her children is not required for application of the beneficial relationship analysis, nor is the focus of the exception on "some narrow view of what a parent-child relationship should look like." (*In re D.M.* (2021) 71 Cal.App.5th 261, 270.) The exception "can apply even when a child has bonded to an alternative caretaker," and the parent seeking to establish the exception is "not required to prove that [the child's] attachment to her was [the child's] primary bond." (*J.D.*, *supra*, 70 Cal.App.5th at p. 859.)

A juvenile court's reference to concepts such as "parental role" or "parenting ability," however, is not improper where the context or court's explanation demonstrates the court was not basing its decision on factors *Caden C.* found inappropriate. (*In re Katherine J.* (2022) 75 Cal.App.5th 303,

---

[12] Minors' counsel's comments were in reference to the incident when mother found the tick on J.P. Counsel argued that this incident "highlighted the fact that this is not the case of the parent-child bond," as mother "had the opportunity to parent these children. She had the opportunity to show an emotional connection to them and do the good parent thing and make her kids feel better in a scary situation and instead she did the opposite" by showing them pictures of engorged ticks. Acknowledging that this was "one visit," counsel continued, "but it was the exact opportunity to be the parent to these kids and she fell short." Counsel believed the children could not trust mother to handle their emotions or physical safety, and argued, "I wish this was the type of bond that the law describes because I know these girls want to have a relationship with their mom and I know that they love her so much; but I thought the statements from the girls in the [section 366.]26 report were incredibly insightful about their own emotional needs and who they look [to] for comfort, and I don't think the court can make the findings necessary under the parent-child bond."

319 (*Katherine J.*).) In *Katherine J.,* the juvenile court concluded the father had " 'not occupied a significant parental role' " because his "unresolved issues with substance abuse and violence had consistently destabilized Katherine's life for years, fatally compromising father's attempts to maintain a strong, positive emotional attachment with her." (*Katherine J.*, at pp. 319–320.) Despite pleasant visits with the child, the father's conduct on certain occasions demonstrated not only that he could not regain custody but that his conduct "traumatized" the child and "significantly impact[ed] the quality of the relationship with her father." (*Id.* at pp. 320–321.)

As we observed in *J.D., "Caden C.* did not address whether, to satisfy the second element, the nature of a parent's relationship must be 'parental,' a descriptor the Supreme Court did not use and that, standing alone, is vague and unhelpful in this context. *Caden C.* said only that the child must have a 'substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship.' " (*J.D., supra,* 70 Cal.App.5th at p. 864, quoting *Caden C., supra,* 11 Cal.5th at p. 636.) " '[T]he words "parental role," standing alone, can have several different meanings,' ranging from 'the person whom the child regards as his or her parent,' the person who demonstrates the 'nurturing, supportive, and guiding' characteristics traditionally associated with 'good' parenting, or 'giving parental care' through such activities as 'changing diapers, providing toys and food, and helping with homework.' " (*Katherine J., supra,* 75 Cal.App.5th at p. 319, quoting *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 210.) *Katherine J.* pointed out that "problems arise when juvenile courts use the phrase 'parental role' without explaining which meaning(s) they impart to it" because "each of these definitions may be useful

as *factors* to determine the strength of a parent's relationship with their child [but] none is dispositive on its own." (*Katherine J.*, at p. 319.)

Mother relies heavily on our opinion in *J.D.,* arguing that we found problematic the same language and analysis she challenges here. Unlike this case, however, the juvenile court's decision in *J.D.* preceded *Caden C.* The attorneys' arguments "alluded to factors deemed irrelevant in *Caden C.*" and the court's comments indicated it was "swayed, at least in part, by such considerations." (*J.D.*, *supra*, 70 Cal.App.5th at pp. 863–864.) We reversed because the juvenile court's finding on the second element of the beneficial relationship exception—that the mother's relationship with J.D. "did not 'amount to a parental bond' "—was conclusory, leaving us unable to "be certain the juvenile court did not rely on improper factors in assessing this element." (*Id.* at p. 863.) Similarly, in *In re L.A.-O.*, the juvenile court's "terse" ruling stated that the parents " 'ha[d] not acted in a parental role in a long time' and the prospective adoptive parents 'ha[d] been acting in a parental role.' " (*In re L.A.-O.*, *supra*, 73 Cal.App.5th at p. 211.) The reviewing court could not determine whether the juvenile court used "parental role" to mean the child "had a substantial, positive, emotional attachment to the prospective adoptive parents but not to the parents," which "would be legally correct" under *Caden C.*, or to mean the parents "were not capable of taking custody, or had not been good parents, or had not been providing necessary parental care," which would be erroneous under *Caden C.* (*In re L.A.-O.*, at pp. 202, 211–212.) In *D.M.*, another pre-*Caden* case mother cites, the juvenile court's remarks demonstrated its error: The court found that the father had not "risen to the level of a parent" because he did not know his children's medical needs and had not attended, or asked to attend, medical or dental appointments, without any reference to attachment

30

between the father and children.  (*D.M.*, *supra*, 71 Cal.App.5th at pp. 268, 270.)

Here, the juvenile court explained its reasoning at length, beginning with its understanding that *Caden C.* required the focus of the analysis to be on the child and reference to the factors *Caden C.* noted might shape the parent-child relationship, including age of the child, portion of the child's life spent in parental custody, positive or negative effect of parent-child interaction, particular needs of the child, and "how children feel about, interact with, look to, or talk about their parents."  (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  The court found that visits between mother and the minors were mostly positive, but the girls showed dysregulation before and after visits which their therapists attributed to the girls' "inability to be themselves with mother, her inability to handle big emotions, and the girls feeling responsible for mother's sadness."  The court then stated, "[m]other has made some statements and taken some actions at visits which do not reflect positively on her parenting ability, but overall, there is love and affection."

Read in context, the court's brief reference to "parenting ability" appears to be no more than an acknowledgment that the visits, while largely positive and affectionate, were not perfect.  The court's subsequent remarks make clear that it considered mother's inability to address the impact of her own statements and conduct on the children as critical to the determination whether the children had a "substantial, positive, emotional attachment" to mother that benefitted the children.  The court discussed M.P.'s conflicted relationship with mother, noting that she yearned for emotional support from mother but did not receive it.  The court stated that M.P. was "unable to be herself or express herself with mother" because "[s]he feels responsible for

31

mother's emotional health," noting that although "[J.P.] has been less expressive . . . the information is consistent." The court's passing reference to mother's "parenting ability" did not obviate its otherwise proper analysis.

***The Court Did Not Improperly Rely on Mother's Failure to Address Case Issues***

After finding that mother "has little to no insight into the reasons behind the case" and had "done little to accept responsibility," the court stated:

"The lack of insight helps define the relationship and although not controlling is relevant to the issue of detriment. The case was opened in 2017, more than four years ago. Given that mother has a lack of insight into why the girls were removed from her care despite all of the effort and services and contested hearings, she is unlikely to ever accept responsibility or accept the need for removal. Creating a guardianship only provides the vehicle for mother to continue fostering these feelings, to believe she was wronged, that the older girls lied, and to keep the girls in a state of perpetual tug of war, which both therapists have warned is untenable for the girls."

Mother argues that the court's remarks demonstrate that it improperly relied on her failure to address a case issue as a bar to application of the beneficial relationship exception in contravention of *Caden C*., which held that "[a] parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception" and "may not be used as a basis for determining the fate of the parental relationship by assigning blame, making moral judgments about the fitness of the parent, or rewarding or punishing a parent." (*Caden C., supra*, 11 Cal.5th at pp. 637–638.) But *Caden C.* also explained that "[i]ssues such as those that led to the dependency often prove relevant to the application of the exception": "A parent's struggles may mean that interaction between parent and child at

32

least sometimes has a ' "negative" effect' on the child," ' " while "a parent who gains greater understanding of herself and her children's needs through treatment may be in a better position to ensure that her interactions with the children have a ' "positive" . . . effect' on them." (*Ibid.*) *Caden C.* did not preclude consideration of a parent's failure to overcome case issues; it cautioned that "the parent's struggles with issues such as those that led to dependency are relevant only to the extent they inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance, by losing it?" (*Ibid.*)

The juvenile court's reasoning was consistent with *Caden C.* The court explained that mother's failure to accept responsibility for placing the minors at risk of sexual abuse and her inability to recognize and prioritize her children's needs negatively affected her bond with the minors, resulting in the minors being unable to reveal their true emotions to mother and "feel[ing] responsible for mother's sadness and for the breakup of the family."

Mother argues that the court did not find that her failure to address these issues affected the quality of her visits with the minors, which she acknowledges would have been a proper consideration. (*Caden C.*, *supra*, 11 Cal.5th at p. 642.) She emphasizes that mother's visits with the children were loving and affectionate but ignores "other evidence the juvenile court was entitled to credit that paint a much more complex picture." (*In re Eli B.* (2022) 73 Cal.App.5th 1061, 1073.) Here, the juvenile court's concerns about mother's lack of insight and failure to take responsibility are reflected in incidents which occurred during visitation. For example, after finding a tick on J.P. during a visit, mother said "and they say I'm not a good mother" in front of the children. Mother's inability to consider the effect of her comments on the children caused M.P. to experience anxiety and a feeling of

divided loyalty when she perceived mother to be saying "mean" things about the resource parents. At another visit, mother told the minors that E.E. lied about the sexual abuse, her lack of insight and denial serving to undermine the minors' relationship with their sister.

In short, we understand the court's remarks as identifying why mother's lack of insight and failure to accept responsibility had been detrimental to the minors during the dependency and would continue, facts that are important to determine the nature of the parent-child bond.

### The Court Did Not Abuse its Discretion

Mother argues that the juvenile court disregarded the minors' expressed wishes, concluding the minors did not really mean or understand what they were saying. She points out that M.P. was only one year short of the age at which she could legally object to adoption (§ 366.26, subd. (c)(1)(B)(ii) [exception to termination of parental rights where termination would be detrimental because "child 12 years of age or older objects to termination of parental rights"]) and the court was obligated to consider J.P.'s wishes as well (§ 366.26, subd. (h)(1) ["[a]t all proceedings under this section, the court shall consider the wishes of the child and shall act in the best interests of the child"]).

The record demonstrates that the juvenile court did not ignore or minimize the minors' expressed wishes: It expressly acknowledged them but found them outweighed by the minors' need for permanency. The record also reflects that notwithstanding the minors' statements that they wanted to be with mother and would prefer a guardianship if it allowed them more time with her, their feelings were ambivalent. As documented in the Agency's reports, the minors were sad about not being with mother but also excited at the prospect of adoption. For example, the Agency's September 2021

34

addendum report describes M.P., at a gathering of the resource parents' extended family, telling one family member after another that the resource parents might adopt her and J.P., "smiling from ear to ear" and happily receiving hugs and positive reactions to the news. The therapists' opinions that the minors needed the permanency of adoption, which were supported by the minors' CASA and their attorney, supported the court's conclusion. The court was required to consider not just the minors' wishes but their best interests. (§ 366.26, subd. (h).)

Mother stresses that because the resource parents were willing to accept a legal guardianship, an order of legal guardianship would not have jeopardized the minors' placement. To the extent she is suggesting this willingness—which was expressed as a fallback to the resource parents clearly stated preference for adoption—should have caused the court to order legal guardianship, she is mistaken. As we have said, when reunification efforts fail, "adoption is the first choice" and the "exceptions to the general rule that the court must choose adoption where possible" must be considered in light of this legislative preference. (*In re Celine R.* (2003) 31 Cal.4th 45, 53, italics omitted.)

Where, as here, "a relationship involves tangled benefits and burdens." "[T]he court faces the complex task of disentangling the consequences of removing those burdens along with the benefits of the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) Ultimately, the juvenile court concluded that even though mother and the minors deeply loved each other, it could not find that the harm of terminating mother's parental rights outweighed "the security and sense of belonging a new family would confer." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 577 ["court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the

security and the sense of belonging a new family would confer"].) The juvenile court understood that its task was to balance the benefit of the parent-child relationship to the minors, and detriment to them from losing it, against the benefit of an adoptive home. The court recognized its decision would cause pain but citing M.P.'s comment related by her therapist, concluded adoption would be for the best in the long run.

The beneficial relationship exception, like the other circumstances specified in section 366.26, subdivision (c)(1)(B), " 'merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 631, quoting *In re Celine R.*, *supra*, 31 Cal.4th at p. 53.) It is the parent's burden to establish the exception. (*Caden C.*, at p. 631; *J.D.*, *supra*, 70 Cal.App.5th at p. 861.) Mother's argument that the court erred is built on her assertion that it considered improper factors in evaluating the nature of her parental relationship with the children. It did not, and we have no basis to conclude it abused its discretion.

## II.

### *The Court Did Not Err in Denying Mother's Request for a Bonding Study*

Mother next contends the juvenile court abused its discretion in denying her request for a bonding study at the section 366.26 hearing. As mother acknowledges, a trial court's decision whether to order a bonding study is reviewed for abuse of discretion. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1341.) "The applicable standard of review is whether, under all the evidence viewed in a light most favorable to the juvenile court's action, the juvenile court could have reasonably refrained from ordering a bonding study." (*Ibid.*) It is appellant's burden to demonstrate that the juvenile court exercised its discretion in an arbitrary, capricious, or patently

36

absurd manner that resulted in a miscarriage of justice. (*In re M.V.* (2014) 225 Cal.App.4th 1495, 1506.)

As earlier noted, mother's initial request for a bonding study was denied at the 12-month review hearing, when the court terminated reunification services. Explaining its denial of the request, the court stated, "I don't think there's any question that mother desperately loves her girls and that the girls really love their mother, that is just not the issue here. As I've articulated [in terminating services], it's just that the risk to the girls is too great and the progress by mother too little to have that take precedence over their safety and permanency." The court felt it had sufficient information about the bond between mother and the girls and it was concerned about the pressure a bonding study would put on the minors, especially M.P.

Mother's brief for the contested section 366.26 hearing argued that the record was replete with evidence of the minors' bond with mother and desire to be with her, and that the Agency's report did not properly present the minors' point of view because it lacked any expert or professional opinion about the importance of the relationship to the children or analysis of whether they would be harmed by severing it. Mother pointed to the footnote in *Caden C.*, which was decided a month after the 12-month hearing, recommending consideration of bonding studies on the question of potential harm to a child in severing the parental relationship, and argued such information was lacking here due to the denial of the request for a bonding study.

A week before the section 366.26 hearing, the Agency filed its response to mother's brief and an addendum report that included letters from the minors' therapists.

At the section 366.26 hearing, mother asked the court to reconsider her request for a bonding study. The court declined, explaining that it had letters from both minors' therapists, who had explored with the minors the nature and extent of their relationship with mother, and felt it had a "good understanding" of the nature of the bond and effect the court's ruling would have on the minors. The court further stated, "I have also heard very loudly from the therapists that these girls are in need of some finality and that ongoing hearings, et cetera, create anxiety and that it would be detrimental to them to initiate yet further proceedings."

Mother argues the juvenile court abused its discretion in denying her request for a bonding study for several reasons: (1) *Caden C.*'s emphasis on the importance of bonding studies; (2) the minors' therapists were not bonding experts, and had not meaningfully observed mother with the children; and (3) the Agency's late filing of the Addendum report containing the therapists' letters "in essence ambushed [mother] and her counsel, providing no recourse for [mother] to counter this evidence submitted by the Agency."

Mother's suggestion that she was "ambushed" by the late submission of the therapists' letters to the court is belied by the record. The Agency's report was filed seven days before the section 366.26 hearing. At the hearing, mother's counsel told the court she was entitled to have the Agency's filing 10 days before a trial and stated, "I know that I do have the right to ask to delay today's hearing, but because I have had a chance to investigate and consider what has been presented, I am not going to do that." Mother thus waived her objection to the timeliness of the report.

Turning to the merits, a bonding study is not required as a condition precedent to terminating parental rights. (*In re Lorenzo C.*, *supra*, 54

Cal.App.4th at p. 1339.) *Caden C.* observed that such studies can provide important information about the psychological importance of the parent-child relationship for the child but did not require them: "Trial courts should seriously consider, *where requested and appropriate*, allowing for a bonding study *or other relevant expert testimony*." (*Caden C., supra*, 11 Cal.5th at p. 633, fn. 4, italics added.) In *J.D., supra*, 70 Cal.App.5th at page 862, which mother also cites as emphasizing the importance of bonding studies, we observed that "a bonding study or other expert opinion" is " 'an important source of information' (*Caden C.*, at p. 633)" but "not required as a matter of law," and that other evidence in the record can be sufficient to provide the necessary information "even in the absence of professional opinion." In the present case, the trial court concluded it had sufficient information, including relevant expert opinion, and ordering a bonding study was *not* appropriate because of the delay it would require and pressure it would put on the minors.

The court here had the opinions of therapists who, although not bonding experts, had been working with the minors in therapy for approximately 18 months and were able to provide professional insight into the minors' feelings about their relationships with mother. As the same judge had presided over this case from the inception of the first dependency, the court also had deep familiarity with and extensive information about the family from the Agency's reports, hearings, and the input of the minors' counsel and CASA. The court's reluctance to delay the permanent plan hearing to obtain a bonding study was supported by the therapists' strong emphasis on the emotional toll prolonged uncertainty about the future was taking on the minors. The court's concern about the pressure a bonding study would put on the minors was supported by evidence that the minors

39

felt responsible for mother's sadness and for the dependency itself; the court was entitled to infer that the minors would feel mother's wellbeing depended on them proving their love for her.[13]  The court expressly recognized that the minors and mother loved each other deeply and termination of parental rights would be painful for the minors as well as for mother.  Based on the totality of the circumstances, we cannot conclude that the juvenile court's denial of mother's request for a bonding study an abuse of discretion.

## III.

### *The Juvenile Court's Determination that Mother Failed to Establish the Sibling Relationship Exception is Supported by Substantial Evidence*

Mother also contends the juvenile court erred in failing to apply the sibling relationship exception to adoption.  (§ 366.26, subd. (c)(1)(B)(v).)  Section 366.26, subdivision (c)(1)(B)(v) provides that the court shall not terminate parental rights if it finds that termination would be detrimental to the child because "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's

---

[13] When mother first requested a bonding study at the 12-month review in April 2021, minors' counsel expressed concern that if the court terminated reunification services and ordered a bonding study, "for [the minors] it will feel like a four-month period of trying to prove to everybody how much they love their mother. . . .  I can't say it would be torture, but I think it would be close to it."  Counsel felt it would be different if the minors were younger and did not understand the purpose of having another person observe them, but the minors were old enough to understand "what this would be about."

long-term emotional interest, as compared to the benefit of permanence through adoption."

"Under section 366.26, subdivision (c)(1)(B)(v), the juvenile court 'is directed first to determine whether terminating parental rights would substantially interfere with the sibling relationship. . . .' [Citations.] 'If the court determines terminating parental rights would substantially interfere with the sibling relationship, the court is then directed to weigh the child's best interest in continuing that sibling relationship against the benefit the child would receive by the permanency of adoption.' " (*In re D.O.* (2016) 247 Cal.App.4th 166, 173–174 (*D.O.*), quoting *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 951–952.) " '[U]nlike the parent-child relationship, sibling relationships enjoy legal recognition after termination of parental rights.' (*In re S.B.* [(2008)] 164 Cal.App.4th [289,] 300.) Thus, it is not a foregone conclusion that terminating parental rights will substantially interfere with a sibling relationship, and the juvenile court must make this factual determination." (*D.O.*, at p. 175, fn. omitted.)

In finding the sibling relationship exception inapplicable, the juvenile court here cited the "strong track record" of facilitating visitation between the minors and their older sisters. The court noted that the older sisters' guardians had known the minors "almost the girls' whole lives" and had a "long standing relationship with them," and that the siblings lived in close proximity to the minors, the girls saw each other "frequently and regularly," and "[t]hat has not changed over the years of this dependency."

In *D.O.,* the juvenile court found the sibling relationship exception did not apply because there was a "proven track record of facilitating visits" and no evidence there would be any interference with the sibling bond. (*D.O.*, *supra*, 247 Cal.App.4th at pp. 169, 172, 176.) *D.O.* affirmed, noting that the

41

juvenile court did not rely solely on "unsupported assurances from the caregivers that they would allow future visits" but also on the "proven track record" and the caregiver's commitment to also take in D.O.'s mother's new baby.

Mother concedes the minors' resource parents had ensured sibling contact in the past and would likely continue to do so in the future. She contends, however, that if the court had considered the "other factors" set forth in section 366.26, subdivision (c)(1)(B)(v), it would have found the sibling relationship "was indeed facing interference." Specifically, mother addresses the statutory directive to consider "the child's long-term emotional interest," arguing that it will be devastating to the minors if their older sisters reestablish relationships with mother and are "still a family" from which minors would be excluded if they are adopted rather than placed in a guardianship.[14]

This argument, to a great extent, inappropriately focuses on the potential for the minors to have contact with *mother* in the future. The basis of the sibling relationship exception to adoption is interference with the bond between the minor to be adopted and his siblings. (*In re Celine R.*, *supra*, 31 Cal.4th at p. 54.)

---

[14] Mother mentions but does not discuss the other factors enumerated in section 366.26, subdivision (c)(1)(B)(v)—whether the child was raised in the same home, shared significant common experiences, or has existing close and strong bonds with the sibling. These factors pertain to the nature and extent of the sibling relationship, which in the present case was indisputably strong. While the juvenile court did not specifically address these factors, it is apparent that its analysis was premised on the existence of a strong bond that was important to continue and appropriately focused on whether termination of mother's parental rights would interfere with that bond.

This argument is also highly speculative. There is no evidence in the record to support mother's suggestion that her older daughters will "inevitably" rekindle their relationship with her and discuss their visits and contact with the minors. Mother notes that "at least one of the older minors was open to visitation with [her] during the case," but her citation to the record is to a September 2018 status review report in the first dependency case, after the minors and N.E. had been returned to mother's care. The report, which recommends termination of reunification services regarding E.E., mentions that "despite having had more contact with her daughter in recent weeks, including an in-person visit together with [E.E.] and her sisters," mother had been unable to address the harm father caused and provide E.E. emotional support. This reference to a visit several years ago, during the first dependency case, offers little basis for an assumption that mother, E.E. and N.E. in the future will "still be a family" from which M.P. and J.P. will be excluded.[15] The future events mother anticipates *may* come to pass; they may not. Meanwhile, the record resoundingly demonstrates the minors' need for certainty and permanence.

It was mother's burden to establish termination of her parental rights would substantially interfere with the sibling relationship, not the Agency's burden to prove it would not. (*D.O.*, *supra*, 247 Cal.App.4th at p. 176.) The evidence demonstrated the sibling relationship would not be disrupted: The resource parents had consistently facilitated frequent visits and other contact

---

[15] As far as we are aware, the only other evidence of contact between mother and her older daughters was mother's testimony at the 12-month review hearing, when asked how she thought the sexual abuse had affected them, that she spoke or texted with E.E. and "sometimes she tells me how she feels, but we never talk about that subject." Mother said she knew "absolutely nothing" about N.E. "since they took her away" because they do not speak. Mother said she did not see either of the older girls.

between the sisters and expressed commitment to continuing to do so; the older sisters' guardians lived nearby, had known M.P. and J.P. most of their lives and had close relationships with them; and the resource parents considered the older sisters' guardians "extended family" and a consistent support. (See *In re Megan S.* (2002) 104 Cal.App.4th 247, 254 [evidence that social worker identified adoptive homes that would allow sibling contact and wanted to place child in such a home demonstrated relationship with sibling would not be disrupted].) Conversely, "selection of a lesser preferred permanency plan would not further the children's interests in maintaining their relationships with [their siblings], nor would it provide them with the security and sense of belonging conferred by adoption." (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014.) Indeed, "the only manner in which the court could serve both of [the minors'] interests was to free [them] for adoption, because [they] would gain the stability of a permanent home and maintain [their] relationship with [E.E. and N.E.]." (*In re Megan S.*, at p. 254.)

## DISPOSITION

The orders are affirmed.

_____
Mayfield, J.*

We concur:

_____
Stewart, Acting P.J.

_____
Miller, J.

*In re M.P.* (A163678)

* Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

45